# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NORTHEASTERN DIVISION

| | |
|---|---|
| FITZGERALD TRUCK PARTS AND SALES, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 2:19-cv-00008 ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is a case about glider semi-trucks and, more particularly, whether excise taxes are properly imposed on the sale of those trucks. A glider truck is built from a kit. Glider kits consisting of new tractor parts, including such things as the cab, frame, sheet metal, mounting brackets and steering gear, are produced by original equipment manufacturers like Peterbilt, Kenworth, Freightliner, and Western Star. Powertrains and other necessary parts are then added and the glider trucks are offered for sale, usually at a price that is less that 75% of the cost of a new truck.

Fitzgerald Truck Parts and Sales, LLC ("FTPS") is a glider kit assembler, and has been for 30 years. (Doc. No. 1, Complaint ¶ 13). FTPS's gliders "begin as worn or wrecked highway tractors, the engines and transmissions of which are capable of being repaired (i.e., rebuilt)." (Id. ¶ 18). When a glider truck is assembled and sold to a customer (usually an independent owner-operator or a small to mid-size trucking fleet), FTPS retains a copy of the previously taxed tractor's title. (Id. ¶¶ 18, 21). It is at this point that the tax dispute between FTPS and the Internal Revenue Service ("IRS") comes into play, setting the stage for the Government's Motion to Dismiss in Part (Doc. No. 18) and Motion to Strike (Doc. 17).

# I. Factual Background[1]

Under the Internal Revenue Code, a 12% federal excise tax is imposed "on the first retail sale" on "tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer." 26 U.S.C. § 4051(a)(1). The code also provides, however:

> (f) Certain repairs and modifications not treated as manufacture
>
> (1) In general
>
> An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

26 U.S.C. § 4052(f)(1).

Because its costs and profits in assembling the glider (including the costs of rebuilding the engine and/or transmission, buying a glider kit, and melding the two) does not exceed seventy-five percent of the retail price of a comparable new highway tractor, FTPS believes that it is entitled to the exception set forth in § 4052(f)(1) and, thus not liable for the 12% tax set forth in § 4051(a). For two decades, the IRS apparently had the same view.

FTPS and its predecessor Fitzgerald Kit Truck and Sales, LLC were examined on four separate occasions between 1991 and 2011, covering tax years 1991, 1996-1997, and 2006-2011. During each of those years, FTPS did not collect excise tax on the sale of gliders. Following each of the examinations, the IRS determined that "FTPS's gliders satisfied the 75 percent safe harbor

---

[1] The following factual allegations are drawn from the Complaint and are accepted as true for purposes of both the Motion to Dismiss, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) and the Motion to Strike, Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 821 (6th Cir. 1953).

math test under § 4052(f)(1) and therefore were not taxable under § 4051(a)(1)." (Complaint ¶ 33). FTPS even received a letter from a District Director of the IRS dated March 20, 1998 that stated, in part:

> It has . . . been determined all of your rebuilt worn tractors using glider kits qualified for the 75% safe harbor provisions per Revenue Ruling 91-27. In conclusion, it is our opinion that no Federal Excise Tax applies to your glider kit installations for 1996 and 1997.

(Doc. No. 1-2 at 1). Unsurprisingly, FTPS continued not to collect the excise tax on the sale of its gliders. (Complaint ¶ 33).

In 2014, the IRS began an examination for each of the tax quarters from 2012 to 2014. On May 26, 2015, the IRS sent a letter informing FTPS that, among other things, it owed excise taxes, penalties, and interest. (Id. ¶¶ 34-36). An accompanying report from a revenue agent opined that FTPS was "not extending [the] useful life of an existing vehicle," but instead was "fabricating . . . a truck tractor that did not exist prior to the fabrication." (Id. ¶ 37).

After FTPS filed a written protest and additional documentation with IRS Appeals ("Appeals"), the parties agreed to mediate their dispute before an IRS Appeals Mediator. An agreement was struck whereby no tax would be due for any period up to that point, but FTPS would begin collecting excise tax on a "prospective basis." (Doc. No. 1-3 at 1). The next day, the mediator confirmed the agreement in a document titled "Mediator's Report," and indicated that "settlement documents will be prepared under established appeals procedures." (Id.). The Mediator's report outlining the terms of the settlement was signed by the Mediator, the IRS Appeals Team Manager, and a representative for FTPS. (Id.).[2]

---

[2] In both its Motion to Dismiss and Motion to Strike, the Government makes a cursory argument that disclosure of the mediator's report violates 5 U.S.C. § 574 and Fed. R. Evid. 480. Both the statute and the rule, however, contain exceptions to the non-disclosure of settlement discussion, none of which are addressed

For whatever reason, however, the IRS chose not to abide by the settlement, and sustained the assessments set forth in the earlier letter. (Id. ¶¶ 47-48). This may have been due, in part, to the fact that "in 2014 the IRS decided to target the glider industry, and specifically FTPS, and reversed its position [on taxibility] in secret, without any public notice" until it issued a cryptically worded notice in 2017. (Id. ¶¶ 91, 92).

On February 28, 2017, FTPS paid the excise tax on one glider for each of the relevant tax periods, for a total payment of $166,690.20. (Id. ¶ 54). Thereafter, on or about April 3, 2017, and April 10, 2017, the IRS assessed taxes, penalties and interest against FTPS for the relevant tax periods. And, what a whopping assessment it was: $64 million for the three year period between 2012 and 2014. (Id. ¶¶ 54, 97). The taxes, of course, were not collected at the time of the sale of the glider trucks, and it is highly unlikely that truckers or fleet owners would willingly pay taxes on trucks that were purchased between four and six years earlier. (Id. ¶¶ 99, 100).

Based upon the foregoing events, FTPS filed a three-count Complaint in this Court. In Count I, it seeks a refund of the federal exercise taxes it paid on gliders after the settlement fell apart. Counts II is a claim for equitable estoppel based on the prior examinations, IRS rulings, and IRS guidance. Count III is also a claim for equitable estoppel, but is based upon the alleged retroactivity of a new legal standard. The Government seeks to dismiss the equitable estoppel claims, and also moves to strike paragraphs 49-53 of the Complaint that relate to the excise tax treatment that other glider dealers allegedly received from the IRS.

---

by the Government. Regardless, the Court need not weigh-in on the issue at this time because even without the allegations regarding mediation, the Court's conclusion would be the same.

## II. Motion to Dismiss

On no less than six occasions in its Memorandum supporting its Motion to Dismiss, the Government quotes from Richmond v. Officer of Personnel Management, 496 U.S. 414 (1990). This is understandable because Richmond is likely the leading case from the Supreme Court addressing equitable estoppel against the federal government and imposes a very high bar to hurdle.

There, a civilian worker for the Department of the Navy was granted disability retirement because poor eyesight prevented his work as a welder. Later, he took a job as a school bus driver, and was paid less than the 80% income limit for continued annuity payments. When plaintiff was offered overtime, he consulted with an employee in the Navy's Civilian Personnel Department who erroneously informed plaintiff that he could earn more than the 80% limit, so long as he did not do so for two consecutive years. Based on this advice, he worked overtime. However, the Office of Personnel Management discontinued plaintiff's benefits when he reported receiving total income in excess of the 80% limit in just one year. All totaled, plaintiff lost disability benefits for six months in the amount of $3,993.

Noting that "[f]rom its earliest cases" it has "recognized that equitable estoppel will not lie against the government as it lies against private litigants," the Supreme Court found estoppel not to be appropriate in the case before it. Id. at 419-20. In so doing, the Court noted that it had "reversed every finding of [governmental] estoppel that [it] had reviewed," even though many of its cases "continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government." Id. at 421-22 (citing Heckler v. Comm. Health Servs., 467 U.S. 51, 60 (1984); INS v. Miranda, 459 U.S. 14, 19 (1982); Schweiker v. Hansen, 450 U.S. 785, 788 (1981); INS v. Hibi, 414 U.S. 5, 8 (1973); Montana

v. Kennedy, 366 U.S. 308, 314 (1961)). Observing that its earlier suggestions about estoppel being a viable claim against the government was usually stated in dicta, and that "we will know an estoppel when we see one" was hardly a "clear[] form of analysis, the Supreme Court nevertheless rejected the Solicitor General's proposal for a "sweeping [and] flat rule that estoppel may not in any circumstances run against the Government.'" Id. at 423 (citation omitted). Rather, the Supreme Court decided the case on the "narrow[] ground" that estoppel is inappropriate where plaintiff seeks "payment of money from the Public Treasury contrary to a statutory appropriation." Id. at 424.

Simply put, Richmond does not stand for the general proposition that estoppel can never be maintained against the Government. Nor does Richmond necessarily preclude the present claims of estoppel.

Unlike in Richmond where "all parties . . . agree[d] that the award respondent seeks would be in direct contravention of the federal statute upon which his ultimate claim to the funds must rest," Richmond, 496 U.S. at 419, whether excise taxes are properly imposed on the glider trucks FTPS assembles is very much in dispute. More importantly, and contrary to the Government's suggestion that FTPS is seeking to "raid the public treasury in avoidance of a real determination of the taxability of Fitzgerald's tractors," (Doc. No. 18-1 at 10), there are permanent appropriations for refunds of taxes erroneously collected. 31 U.S.C. § 1324(a). There is also a statutory scheme addressing how to go about obtaining such a refund, including filing a timely claim with the IRS, and filing suit upon denial of that claim. United States v. Dalm, 494 U.S. 596, 602 (1990).

Furthermore, this case is not analogous to one in which a Navy specialist unknowingly gave the claimant outdated forms issued by another agency, and represented to the plaintiff that he would be eligible for continued benefits so long as he did not exceed a specific salary limit. Mistaken

6

advice on one or two occasions by someone arguably not in the know is one thing, but mistakes made on four separate examinations in three different decades may be quite another, particularly where the Government is seeking to collect excises taxes in the tens of millions of dollars that the taxpayer never collected and never had the benefit of.

Richmond aside, the Government argues that (1) "the complaint lacks any claim that the United States ever committed intentional or reckless affirmative misconduct that misled [FTPS]"; (2) "[t]here is also no mention in the complaint of a false representation of fact by the Service"; (3) the Complaint "does not meet the heightened burden required to estop the United States in this refund suit"; (4) FTPS "ignores a fundamental principal of federal tax law: . . .each tax period stands on its own"; (5) FTPS "also ignores that the Service has argued since at least the 1960s that some uses of glider kits to create tractors could constitute manufacturing, and those sales were therefore subject to the federal excise tax"; (6) "[t]he Service's continued efforts to determine the taxability of [FTPS's] sales of different tractors during new tax periods show that the Service was fulfilling its mandate to ensure compliance with federal law"; (7) "[t]he Service conducted its normal examination functions for new tax periods"; and (8) "[i]t is unreasonable, as a matter of law, for [FTPS] to rely upon the results of a previous audit to determine the outcome of a subsequent audit." (Doc. No. 18-1 at 6-8).

The majority of these arguments are only resolvable in the context of a motion for summary judgment where the undisputed material facts are supported and identified, or at trial where the facts are weighed. Take, for instance, items (4) through (8). The statement that the IRS has argued since the 1960s that *some* uses of glider kits *could* constitute manufacturing is awfully nebulous and begs more questions than answers, not the least of which is whether those other gliders were similar to

the ones assembled by FTPS. The arguments that the IRS simply performed its mandate and "normal examination functions" may well be true, but the Court has no evidence before it to support those contentions. It may also be true that "each tax period stands on its own," but it does not necessarily follow that it was "unreasonable, as a matter of law," for FTPS to rely on those audits for subsequent tax years if, in fact, the item it was producing was the same year-after-year.

The Government's remaining arguments fail when considered in light of the elements of an equitable estoppel claim, and the standards of review governing motions to dismiss. "'Estoppel is an equitable doctrine which a court may invoke to avoid injustice in particular cases.'" Michigan Exp., Inc. v. United States, 374 F.3d 424, 427 (6th Cir. 2004) (quoting Fisher v. Peters, 249 F.3d 433, 444 (6th Cir. 2001)). "'[T]he traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel.'" Id. (quoting LaBonte v. United States, 233 F.3d 1049, 1053 (7th Cir.2000)). Because, as Richmond confirmed, the government may not be estopped on the same terms as other litigants, "'[a] party attempting to estop the government bears a 'very heavy burden' in sustaining its argument.'" Id. (quoting Fisher, 249 F.3d at 444). "At a minimum, the party must demonstrate some 'affirmative misconduct' by the government," which is "more than mere negligence" and requires an intentional act "that either intentionally or recklessly misleads the claimant." Id.

The time for FTPS to carry its burden, or demonstrate and prove its estoppel claims is not now, however. Rather, Rule 8 of the Federal Rules of Civil Procedure merely requires a "short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 12(b)(6). "To survive Rule 12(b)(6) dismissal, 'a complaint must contain sufficient factual matter, accepted

8

as true, to 'state a claim to relief that is plausible on its face.'" Harnden v. St. Clair Cty., No. 18-1402, 2018 WL 8018118, at *2 (6th Cir. Oct. 25, 2018) (quoting Ashcroft, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

> Among other things, the Complaint in this case alleges:
>
> Between 1991 and 2014, the IRS consistently ruled and published guidance indicating that worn semi-tractors that were repaired with glider kits were exempt from excise taxes, so long as they satisfied the 75% math test. (Doc. No. 1, Complaint ¶¶ 68, 72-75, 87).
>
> FTPS never collected excise tax on the sale of a glider where the cost of repairs were equal to or less than seventy-five percent of the cost of a comparable new tractor. (Id. ¶¶ 27, 29, 32-33).
>
> The IRS examined FTPS and its predecessors four separate times between 1991 and 2011, and each time indicated that the gliders FTPS assembled were not taxable. (Id. ¶¶ 28-32, 89);
>
> FTPS received at least one letter from a District Director of the IRS indicating that its rebuilt worn tractors using glider kits qualified for the safe harbor provision pursuant to Revenue Ruling 91-27. (Doc. No. 1-2 at 1).
>
> The IRS decided to target the glider industry (particularly FTPS), and in 2014 secretly changed its position regarding the taxability of glider trucks without any public notice. (Complaint ¶¶ 90-92);
>
> Around the time the IRS changed its position, it began examining FTPS for the fifth time. (Id. ¶¶ 34, 76, 79, 91).
>
> The IRS assessed approximately $64 million in taxes, penalties, and interest against FTPS on the same types of gliders that were previously found to be exempt from excise tax.( Id. ¶¶ 54-58, 97).
>
> The IRS treated other glider dealers more favorably than FTPS by allowing them the safe harbor provision. (Id. ¶¶ 49-53).
>
> Requiring FTPS to pay almost $65 million of tax, penalties, and interest, none of which FTPS ever collected or possessed, would create an undo hardship for FTPS. (Id. ¶ 101).

9

These allegations and the reasonable inferences to be drawn therefrom more than sufficiently allege the elements of an equitable estoppel claim.

In arriving at the conclusion that dismissal is unwarranted at this juncture, the Court has considered the cases cited by the Government and, in particular, Volvo Trucks of North America v. United States, 367 F.3d 204 (4th Cir. 2004), which it characterizes as being "similar," (Doc. No. 18-1 at 9), and Hollow v. United States, No. 96-1229, 1998 WL 760908, at *1 (W.D. Tenn. Feb. 4, 1998), which it claims to be "on all fours" with the present case. While both involved (1) the applicability of excise taxes to either trucks or trailers and (2) equitable estoppel claims against the Government, it is there the similarity ends.

In Volvo, the Fourth Circuit observed that "estoppel requires reasonable reliance," and "conclude[d] that Volvo could not reasonably have relied upon individual IRS agent's representations that the unambiguous provisions of the law need not have been obeyed." 367 F.3d at 212. Here, of course, the estoppel claim is not based upon a couple of agent's representations about an unambiguous law; it is based upon what may be characterized as repeated assurances over the years by the IRS, including at least one letter from a District Director that FTPS was in compliance with the applicable Revenue Ruling. See, Ammex, Inc. v. United States, 367 F.3d 530, 535 (6th Cir. 2004) (quoting Rev. Proc. 89–14, 1989–1 C.B. 815) (observing that "[r]evenue rulings are written and reviewed at the same level of the IRS and the Treasury Department as are Treasury regulations, demonstrating that a 'central board or office' accords a great 'degree of . . . care" to their issuance"); Aeroquip-Vickers, Inc. v. Comm'r, 347 F.3d 173, 181 (6th Cir. 2003) (citation omitted) (stating that revenue rulings "constitute 'precedents to be used in the disposition of other case'" and serve as "official interpretation[s]" by the IRS of the tax laws").

Hollow is distinguishable because it was decided on summary judgment after the factual allegations had been developed. It is also distinguishable because the taxpayer "acknowledge[d] that the excise takes were properly assessed," but sought to avoid payments based upon unidentified IRS agents who allegedly made contrary oral representation. 1998 WL 760908, at * 2. Here, of course, the very applicability of the excise tax is disputed; at least one Revenue Ruling allegedly supports FTPS's position according to the IRS; and FTPS has received written correspondence from the IRS confirming that its gliders were not taxable.

The Government's Motion to Dismiss in Part will be denied.[3]

### III. Motion to Strike

In paragraphs 49 through 53 of the Complaint, FTPS alleges that the IRS treated others more favorably by not taxing the gliders those parties built, including gliders "repaired and assembled by the same company (an FTPS affiliate) that repairs and assembles the gliders FTPS sells." (Complaint ¶ 51). The Government moves to strike these allegations under Rule 12(f) because they are immaterial and impertinent. Specifically, it argues that 21 U.S.C. § 6103 prohibits the Government from disclosing third-party tax information; "allowing [FTPS] to plead third-party information would foist a fishing expedition on the United States"; "the allegations about non-parties are not material to the *de novo* determination of [FTPS'] right to a refund of a taxes paid"; and "insertion of this poison pill in the complaint allows it to manufacture government animus from whole cloth by creating the false impression that the Service is not fairly administering the tax law."

---

[3] Incorporated within its motion for partial dismissal, the Government requests that it be allowed fourteen days from the entry of an Order within which to respond to the Complaint. It would have been better for the Government to file a separate motion making this request because it ran the risk of the motion being denied and the time having run while the Motion to Dismiss was being briefed and decided. Nevertheless, and there being no opposition, the Court will grant the requested extension.

(Doc. No. 17-1 at 2, 3, 5, 6).    This Motion requires little discussion.

Under Rule 12(f), a court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Such motions, however, "are viewed with disfavor and are not frequently granted." Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co., 783 F.3d 1045, 1050 (6th Cir. 2015) (citing Brown, 201 F.2d at 822).  Indeed, a "'motion to strike should be granted only when the pleading to be striken [sic] has no possible relation to the controversy.'" Parlak v. U.S. Immigration & Customs Enf't, No. 05-2003, 2006 WL 3634385, at *1 (6th Cir. Apr. 27, 2006) (quoting Brown, 201 F.2d at 822).

The Government's concern about having to disclose confidential taxpayer information may not even come to pass.  Fairly read, the allegations are made based upon FTPS's own information about how others were treated.  The Government's concerns about "fishing expeditions," and the insertion of an irrelevant "poison pill" into the litigation are better addressed if, and when the issues arise, in the course of discovery.

Finally, the Court cannot say that the paragraphs requested to be stricken have no possible relation to the controversy, especially given the equitable estoppel claims and the requirement that FTPS establish a misrepresentation, reliance, and harm.  Just as one example, if FTPS learned from other glider assemblers that the IRS deemed their gliders to be non-taxable, this could go towards the issues of whether FTPS reasonably relied on allegedly the same advice from the IRS.

The Motion to Strike will be denied.

### IV. Conclusion

On the basis of the foregoing, the Government's Motion to Dismiss in Part (Doc. No. 18) and Motion to Strike (Doc. 17) will both be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE